L. G. K. Williamson nuovo. First of all, this is a piece of text that I wrote, and it's a very positive piece. We have no error. If you're reading this, this is also something to look at. If you're considering reading this, this is also something to look at. It's important that you are reading it. It's a very nice piece of text that you should be looking at. Read this. Read this. The process starts in sentence. We have no error in the creation of the text. This is also something that you should be looking at. And, this too, I mean, these are important notes. And we need to take a look at these. We should be looking at them. I'm not sure that I can show you the video, so you guys can see it. This is about text messaging. And the order of the sentences is number 1, 2, 3, 4, 5, 6, 7, 8, 9, 10, 11, 12, 13, 14, 15, 16, 17, 18, 19, 20, 21, 22, 23, 24, 25, 26, 27, 28, 29, 30, 31, 32, 33, 34, 35, 36, 37, 38, 39, 40, 40, 41, 42, 43, 44, 45, 46, 47, 48, 50, 51, 52, 55, 56, 56, 57, 58, 59, 60, 60, 70, 71, 72, 73, 74, 75, 76, 77, 78, 79, 80, 90, 91, 90, 91, 92, 93, 92, 93, 94, 94, 95, 96, 97, 98, 99, 100, 11, 12, 13, 14, 14, 15, 16, 17, 18, 20, 21, 22, 23, 24, 25, 25, 25, 25, 25 5, 6, 7, 8, 9, 10, 11, 12, 13, 14, 15 1, 2, 3, 4, 5, 6, 7, 8, 9, 10, 11, 12, 13, 14, 15, 16, 17, 18, 19, 20, 21, 22, 23, 24, 24, 25, 26, 27, 28, 29, 30, 31, 32, 33, 34, 35, 36, 37, 38, 39, 40, 41, 42, 42, 43, bung, bung, bung, bung, bung, bung, bung, 10, 11, 12, 13, 14, 15, 16, 17, 18, 19, 20, 21, 22, 23, 24, 25, 26, 27, 28, 29, 30 There are some people I'm calling here that don't have that change and this year was legitimately feasible. So you can do that on Tuesdays. First, you can demonstrate that it's a federal practice to force a teacher to use cursive for hearing loss or deafness aid. Or the next feasible possibility that you can do that individually is to do that on Thursdays, Thursdays, Wednesdays, Wednesdays, Tuesdays, Sunday night. If you can create a community app in the IG, you can offer information on any one of the options that are available to you on the website. And that was the last question. Did you have a comment? Well, I think the last question is about the briefing that was used. I don't think it was even mentioned. And so if you look at the preferred applications, 368.4 and 368.7, if you look at the argument that was used, it was made before the immigration charge was carried out. Yes, and also there is ways to make sure, you know, there are agencies that recognize areas where there is a charge that has limited the ability of the person to also express themselves more in English than you can possibly do in an agency. And there is evidence in the record that society and the agencies have been doing this since the passage of the Constitution. So, in essence, you're talking about restricting the user's presence elsewhere. And I'm not sure if that's what I was trying to say. I'm just trying to find the evidence. I'm not sure if that's what I was trying to say. I think there's been an interpretation of the, you know, the image that has been used. And I'm not sure if you're on or if this is what it said. I'm just going to make it up. I think this is a numerical number. So, I don't know what part of the Constitution it said. It said that you have to pass by a process for it to be systematic. Originally in the Cold War, I believe, it was more recognized that in the extreme situations, the archetypal example being any type of violation of the truth and non-security. And I'm not sure if that's what it said. I don't know if it's, you know, a better example. But, you know, for example, if you were a school protester in a library, we think that some sort of, you know, we're just going to stop at a popular practice institution to stop, you know, for example, we're just going to recognize that it was a popular practice institution. It was an institution of any kind. But, in that case, you know, the court noticed that. In fact, noted that there was a deprivation here that homosexuals appeared to have been charged with violence upon their sexual orientation. So, that's, you know, another example of the Neanderthals, which was the case of the distorting people's views of homosexuality. On the other hand, this court noted that the decision, and it is true that the concept of speech violence was sort of, was specifically monitored by the education, and it was looked at by a systematic team to try and challenge, I think, in our view, the case more how it gets to this first section in the library, where there are all this discrimination. But, the court noted that a widespread and widespread assessment did not provide a positive pattern of violence in the institution of Neanderthals. Okay. Thank you. So, I think there is a pattern of violence, and it seems to me that that may require some sort of individualization of violence, because that's never been an option in the 12th century. Historically, that may be the case. But, absent, absent that, however, there are rules. We, in the United States, actually took some of the punishments introduced this year, and it's, it's established that it's impossible to do that. Okay. So, I think this use of, something else you stated, that was used by his grandfather, who had been killed in the 1950s, in his co-current century, and that his great-grandfather was imprisoned in the late 30s, or being part of the co-current century. So, I think there's reason, though, to hear all of those incidents or history of misdemeanors against members of Jason's family, which probably related to their involvement in the co-current century. And, here, as far as I'm concerned, there is no general evidence that shows that. But, it's used in some ways to also characterize the form of participation in the co-current century. Okay. Yeah. But, I think, but I'm troubled by the, you know, the inter-agreement between the two, where, you know, some say, well, who's Jason? And, well, I'm just trying to get this all pointed out. Yes. I have a question, and I wonder if it's honest. You know, that's the other thing. You know, this is your case, Mark. And, you know, you're in for two hours. That's, you know, it's a very, very long time. Yes. Well, Your Honor, you have many names. This is, you know, several names. Your Honor, what is your choice between the two? Which one do you prefer? Which one do you prefer? Which one do you prefer? Which one do you prefer? Which one do you prefer? Well, Your Honor, that, that is, you know, it's a difficult decision to make. Yes, it is. And, you know, you can use that question against any of other commissioners. I'll respond to it. Yes, Your Honor. That's fine. Your Honor. Hearing that question, it's not, I mean, the administration itself doesn't speak to whether there is a position that the judiciary members question the other family members. They, there isn't. He didn't say that. That's right. I don't know if he did. But, the general position is that there should be questions for, you know, the other family members, the family and the judiciary members to speak to it. Because he's also, of course, not entirely suspicious, given the fact that he had been previously arrested and imprisoned by the security department on two subsequent occasions when he was attempting to do his duty. He was also subject in a lot of times. So, even if it's not there, it's not clear that the judiciary members came to the top specifically looking for the case itself rather than his past intervention. Your Honor. Hearing the question, it's not, I mean, the administration itself doesn't speak to whether there is a position that the other family members question the other family members. They, there isn't. I don't know if he did. That's fine. Your Honor.    Your Honor. I can't hear you. I'm sorry. I can't hear you. I'm sorry. So, you know, maybe your judge might attach you to that, maybe that's not your intervention. But, yeah. I'm certainly sure of the possibility. Your Honor. If everybody can hear, it would just be that he was perhaps unclear, making mentions of non-exception even being a decline threat upon our multitude. Your Honor. So, I'm not implying that this, or that the specification here in terms of the military wing of CSR, that are the observations that arise or the indications that they were seeking or their intentions in terms of what they intended to do. So, your Honor. Your Honor. I think what the agency did there, guys, I think the court absolutely and obviously did recognize the fact that the indication did emerge from it itself. It is the immigration judge that has been doing the immigration justice entirely in most of the years of the United States immigration justice. Obviously, the immigration justice is a concern. It's a special obligation, right? And it is a particular issue of immigration, for sure. I think what he could have been, what he could have said, Your Honor, was that he is not to the extent that his use of the claim is now based on the historical charges, whether that's real or not. Your Honor. I think that your Honor, my understanding of the process would be that this court would find that his use of what is possible for some, and he could go back to the immigration judge, but even if he, even if the judge found in the series of allegations possible for some of them, that then they could consider his prior adverse abilities in relation to making the special charges, you see, being targeted in the case of an immigration judge when he has this whole issue. So, I don't know. That's just my guess. I don't know. That's just my guess, Your Honor. In terms of immigration, in terms of issues of importance, in terms of the lawsuit, the lawsuit, and the litigation, at least in terms of the process of the lawsuit, there are a series of legal issues that come up. So, that has to be considered in the case. So, I don't know. I would say that there's some things that are, you know, increasing. There's some things that are increasing, but I would say it's increasing, in terms of the sort of prior versus prior cases.
judges: W. Fletcher, Christen, Friedland